1-23-0092-WC, Quality Saw & Seal, Inc. v. Illinois Workers' Compensation Comm'n, James Balthasore, Appalooie, Randall Sladek If for some reason you see a glare off of my glasses, I don't have a way to fix that the way the computer screen is, so if it's distracting, I apologize. Again, Amy Turnbow on behalf of the appellant in this case, Quality Saw. With respect to the appellant's brief in this matter, I know that we argued and placed six particular issues for review. With respect to the majority of the matter of law questions, as the appellant, I simply want to point out that with respect to the causal connection issue and Dr. Cohen's opinions regarding whether or not the petitioner had a legitimate permanent restriction of 20 pounds, I would point out in the deposition testimony of Dr. Cohen that at the start, he was asked to provide his opinions within a reasonable degree of medical and surgical certainty, and if for any reason that opinion deviated, that he would alert to that effect. At the conclusion of cross-examination and at the beginning of redirect, Dr. Cohen was asked whether those restrictions that he placed were due to petitioner's, excuse me, employee's inability to obtain the recommended additional physical therapy rehabilitation. And Dr. Cohen's answer, unprompted other than asking for that clarification, was on page C875, and his answer indicated that he went through and stated that his opinion was that the employee never got what he felt was appropriate level of rehab and therapy, and that he placed the employee at maximum medical improvement, and then stated, is it possible that with appropriate conditioning, he could lift more than my arbitrary limit? Absolutely. And the purpose of the argument in this matter of a matter of law issue is that by definition, the doctor actually took himself out of the reasonable degree of medical and surgical certainty and prompted himself by saying that the restriction that he gave the employee was, in fact, arbitrary. By definition, the word arbitrary means based on chance rather than being placed or based by reason. But wasn't the context of that statement in the context of needing additional therapy before they could exceed that limit? It was partially, yes, it was partially in context of that, but it was also based on a fallacy where Dr. Cohen continually admitted that it was his understanding of the employee's medical treatment that he hadn't had any additional physical therapy or rehabilitation. And the evidence was there that actually documented that there was therapy that the employee had, and Dr. Cohen admitted that he may or may not have had all of those radical records at his own attention for review. So, in terms of the context of that, it's a double sword. It was also at the end of cross-examination where the employer was asking Dr. Cohen on cross whether evidence that the employee was doing things either beyond what he stated, or was performing activities that were in excess of 20 pounds would alter those opinions regarding the restrictions. So, it's sort of a juxtaposition combination problem, but it's there and it's a deviation from what you would even argue or even consider a reasonable degree of medical and surgical certainty. Dr. Cohen, it's his own word. It wasn't prompted by someone else. It was his own word, and as the employer asserts, it's an admission that that 20-pound restriction was arbitrary at that point. It's not based on any sort of physical functional deficit that Dr. Cohen could see. There's actually evidence in the record that when the employee saw Dr. Cohen in December 2018 in follow-up, 7 months before this last visit, that he was showing elbow grip strength of 75 pounds and only having some achiness after vigorous activity. Furthermore, the employee told Dr. Fitzgerald in January of 2019 at a visit that the elbow minimally bothered him. He did not feel he was limiting him in any activity with respect to his elbow. That's the employee's own statement to the doctors about the physical status he felt himself as to his capabilities with his elbow. There's also very limited documentation in the medical records back and forth regarding the physical exam findings that Dr. Cohen had as to what extent he really examined the elbow or tested it. The own statement in the medical records on that July 24th visit is that he had some, like I said, minimal achiness with vigorous activity, but there was nothing showing that he had true functional deficits. Obviously, he had surgery. There's obviously something there, but then Dr. Cohen even admits in his opinions, his elbow itself most likely will never be back to normal. But then again, also states that that restriction was arbitrary. Having said that, with respect to that causal connection argument, even if your honors don't take it to a level of stating that this is an error as a matter of law, it would give rise to an error as a manifest weight of the evidence because it is, in fact, the doctor admitting that he's provided an arbitrary restriction. Part of his opinion regarding the need for a 20-pound arbitrary restriction is that he didn't feel that the employee had obtained the physical therapy that he felt he needed for rehabilitation, which again is not supported by what's actually shown in the record, which is that he was, in fact, getting therapy. He had very limited functional deficits by his own standard by the time he was examined by Dr. Cohen in July 2019. If you then remove the causal connection as being against the manifest weight, at that point, the employee no longer has a physical limitation of work restrictions, which then brings into question all of the other issues with respect to TTD and maintenance. As the appellate here now, my apologies. You're addressing the elbow, but what about the subsequent cardiac arrest and the conditions about that? Who's Dr. John Kress? Dr. Kress was, and my apologies. I believe he was associated with one of the cardiology department. The two doctors that I had focused on, and again, my apologies, because there were multiple doctors in their practices. My notes indicate he's at U of C. He's a pulmonologist. Okay. Thank you. Thank you, Your Honor. With respect to the pulmonology and the cardiology, by the time we get to July 2019, when Dr. Cohen released him from an orthopedic standpoint, the only two doctors he saw thereafter were Dr. Sangani and Dr. Fitzgerald. Dr. Sangani was the cardiologist who he saw in August of 2019 and then one last visit in February of 2020, and he saw Dr. Fitzgerald in September 2019. To answer the question in terms of what about his other conditions, again, after July 2019, when he's released from an orthopedic standpoint for the elbow, he had already been released for the shoulder previously. With no restriction. Dr. Sangani saw him August 12, 2019, and there's no work status discussed whatsoever. He sees Dr. Fitzgerald in September 2019, and is actually deemed at maximum medical improvement. Again, with no work status or no restriction noted. Thereafter, the last time he sees Dr. Sangani is February 17, 2020, and it's Sangani's office. He was evaluated by the nurse practitioner, and this actually occurred after the vocational assessment. But again, there's no work status and no restriction noted. So, in terms of the employee status, as of July 2019, he's given a work restriction and placed an MMI for the elbow of 20 pounds. Thereafter. Let me ask you. Let me back you up. I'm John Kress, pulmonologist. Why did the claimant see him? Was that an IME or what was going on with that? I believe that was due to my apologies. Your Honor, if you'll just bear with me. Because he saw I have the November 6th of 2018. Yes, I have the medical chronology in front of me. If you'll just bear with me while I switch into it. My apologies. Okay. I do believe that was on referral. It is documented as a follow-up in Dr. Fitzgerald's January note. It was for ongoing chest pain concerns. So, I do not have that as an IME. I have that as a referral in my record. Didn't Kress diagnose his cough and other problems as having been the result of his intubation and cardiopulmonary resuscitation?  I do not have that as an IME. I have that as a referral in my record. Didn't he also indicate that the claimant's physical and neurocognitive dysfunction may hinder his ability to work? This should be assessed by appropriate specialists in these respective areas? Absolutely. And the evidence in terms of his medical treatment thereafter documented that the treatment continued on with the cardiologist, which was Dr. Senghani, and then also continued on with Dr. Fitzgerald from the brain aspect of things. And there was never any final determination or any assessment that limited him and gave an opinion that said he couldn't work thereafter. Again, Dr. Senghani is the last physician who evaluated him in the record, which was February 17, 2020, and there's no discussion of any work limitations for him at that time. With respect to the TTD award in this case, I want to point out to your honors that the commission decision awarded TTD benefits through January 22, 2020, which was the day before he was evaluated by the vocational counselor on January 23, 2020. Again, if you look at his medical status and work status, July 24, 2019, he's placed at maximum medical improvement orthopedically for the elbow. Again, had already been placed at MMI for the shoulder. By September 2019, Dr. Fitzgerald opined he was at maximum medical improvement. Dr. Senghani doesn't say MMI, but also doesn't place any type of work status or work restriction on him. Let me stop you again, please. Who is Dr. Stephen Rothke? Dr. Rothke is, one second. Dr. Rothke is a board-certified clinical neuropsychologist that saw the claimant on December 5, 2018. Now, this is not in your brief at all, much like Dr. Kress's information and what he had said is not in your brief at all, but it says in a report dated December 12, 2018, Dr. Rothke noted the claimant suffered from deficits in information processing speed, manual dexterity, variability in attention and concentration, new learning capacity, and memory for both visual and verbal information. He concluded the claimant's deficits likely had a multifactorial etiology, including anoxic brain injury, untreated obstructive sleep apnea, and ongoing depressed mood and anxiety. He also concluded delays in his treatment due to multiple workers' compensation carriers' denials contributed to exacerbation of claimant's symptoms. And he recommended that he receive cognitive behavioral therapy and consult with a psychiatrist regarding pharmacological intervention. You know, it kind of bothers me that none of that information is in your brief. I mean, you just kind of completely glossed that over. Also, Dr. Balk, Robert Balk, he notes that Dr. Kress performed an IME. So, I don't know how much of a question there is if whether an IME was done by Dr. Kress or not, but at least Dr. Balk seems to think that that is what happened with Dr. Kress. So, I'm less concerned about the elbow injury and more concerned about the resulting injuries that he suffered from the cardiac arrest and the lack of treatment that was due, in some part, to the delay by your client denying coverage. If you want to address any of that, I know I'm taking up some of your time and I know you're running out of time. Understood, Your Honor. To answer your question regarding Dr. Rothke, that's actually documented and that was on referral after Dr. Fitzgerald referred him. In follow-up on January 11, 2019, Dr. Fitzgerald was commenting on the evaluation by Dr. Rothke and the employer would simply say, with respect to the ongoing care thereafter, Dr. Fitzgerald continued with his care after that point, and Dr. Fitzgerald placed him at maximum medical improvement in September 2019. And it was in follow-up for what was considered the anoxic alleged brain damage. He reported that short-term memory was still an issue, but he was stable, etc. There was also documentation that he was two years post-operative from the injury. Neuroplasticity mechanisms that would have taken over have reached MMI, and that could be the way his memory would be going forward. He potentially could repeat a neuropsych exam to monitor gains, etc., but effectively placed him at maximum medical improvement. Again, I understand that there's concerns about what was happening. The gentleman also had some previous issues that dated back to as far back as high school, as even evidenced by the history he gave to the vocational counselor. Having said that, in terms of what Dr. Rothke's concerns were, that was a referral from Dr. Fitzgerald, and Dr. Fitzgerald continued his care, and it was Dr. Fitzgerald who placed him effectively at maximum medical improvement in September 2019. So I would say that with respect to the concerns that Dr. Rothke placed or the opinions that he rendered, the follow-up didn't occur in terms of the fact that Dr. Fitzgerald kept his care and continued on with his assessment of his needs or lack thereof at that point. Your time has been up for a little while. We've let you continue, but you will have time in reply. Thank you, Your Honor. Mr. Sladek, you may respond. Thanks, Your Honor. May it please the Court, Your Honors. Randall Sladek on behalf of the appellee, Mr. Baltazar. I think it's important to note that benefits were cut or terminated long before Dr. Cohen was deposed. This carrier decided to terminate benefits without any justification, and I think the reviewing courts have found that to be true and have affirmed that all the way up. To be clear, Dr. Kress is unequivocally a Section 12 examiner in this case, and I agree with Your Honor that the respondent or the appellant here has just chosen to ignore that, and they've chosen to ignore Dr. Rothke and Dr. Fitzgerald and really any evidence that goes against what they want, which was to terminate benefits. And in the same way, I believe that they're trying to ignore the standard of review here, which is manifest weight of the evidence. There's no question of law here. They would like the courts all the way up to find Dr. Neal's opinion more credible, and it's just not. And cherry-picking one word that Dr. Cohen said in a long deposition where he chronicled his treatment over five years, he's one of the most credentialed hand surgeons in Chicago, and to say that he didn't understand what was going on at the time is just wrong. He did. And all of the actual evidence, not any theories posited by the other side, all the evidence show that what he understood at the time was actually true. The therapy had been stopped. The records are full of notes from him, hands-on in this case, saying, this guy needs more therapy. I think I could get him over the hump. And the therapy was denied and never paid for. So for the appellant to be here and blame my client for things he did or didn't do, I just think that's outrageous. And I don't mean to speak out of turn in this court and say things of that nature, but I'm befuddled by what has been put forth here by the appellant and kind of the out of touch with the actual evidence of what occurred with this gentleman. And so I'll generally stand on my brief, but I just wanted to point out the penalties were awarded in this case and fully warranted. Mr. Sladek, this controversy seems to focus on the word arbitrary used by Dr. Cohen. Would you address that as to why, in your view, that isn't so important from your perspective? Sure, sure. I've thought about that and I've read the transcript a number of times and I wish he had used a different word, right? Because I don't think it was arbitrary. I think it was founded in his treatment and his expertise. You know, throughout treatment with any case, we're asking a doctor, an orthopedist at any point, in any case, to give restrictions to these injured workers so that they know whether they can return to work. And obviously not every time is it based on some functional capacity evaluation or strength tests. I mean, it's a volume practice and they're examining these people and giving them restrictions based on everything they know. So it's a poor it's a poor choice of word in that instance, but it doesn't take away from his overall opinion, which is, again, well based in his expertise and his long history through two trials. You know, I don't know how many years at this point of seeing this gentleman performing the surgery. So I don't like the word that he used, but I don't think it takes away from his overall. Well, I have a question. This was in a deposition, is that correct? It is. And was this on cross, obviously? It was on cross. I was on cross examination that he used that word. Did you do the deposition? I did. I've been here every step on this case. Did you have an opportunity for redirect? I did. I did have an opportunity. I did. The word did not catch me as important at the time, to be honest with you. I didn't think it was so igniting in the case, but no, I did not fix it at the time. The next time you will. Yes. Yes. Lesson learned, I suppose. You want to continue on with your response? Yes, Your Honor. So, you know, I don't care to read my brief to you to all here. I would just say I think the courts have gotten this right all the way up. I think Judge Duffy completely understood what was happening here and wrote a very sound opinion. And I would request that it be affirmed. Thank you, Mr. Slater. Miss Turnbull. Yes, Your Honor. Just as a point with respect to what you asked briefly, Dr. Cohen's statement regarding the word arbitrary was actually on redirect. It was not on cross-examination. So that was the prompting of the employee's own questioning. Having said that and not to belabor, I just wanted to point out with respect to the other argument regarding maintenance benefits in this case. The testimony from the employee is on the records pages 55 through 61. And if you go through and read that testimony, what it supports is allegedly the employee looked for approximately nine jobs in quote early 2020. There's no documentation of when he did that other than early 2020. How he did it, if it was in person, if it was by the phone, if it was online, if he filled out an application. Beyond that, if there was any contact information, et cetera, there were no job logs produced. Thereafter, as the testimony flows on those six pages in July 2020, there's a discussion of him looking for grass cutting jobs. And he says in response to how he was looking for jobs and what he was doing, quote, and that stuff that I could do while driving, that's the main thing to look for. When you read through the flow of that testimony, he then in the July section, he looked for what amounts to be 11 jobs thereafter. With no timeframe on how long that occurred, other than allegedly it happened at some point prior to the day of trial in March of 2021. He said a couple of names in the July section, but those were duplicating what he'd already said, which is why I hit on 11 total in that scenario. Even arguendo, that he had permanent restrictions, there's no documentation here other than him saying, I looked for these jobs. That was put into evidence that would satisfy the entitlement to maintenance benefits during that time period. Furthermore, he actually, in the July statements for those logs, he said that one of the places he applied for was Tony's Pizza. He actually got that job and was working there. Obviously, when he testified at trial, it was delivering two nights a week, et cetera. But it is a fact that he got a job based on something that he allegedly had been looking for. The more interesting aspect of this that I just want to point out before my time runs out, is that he admitted that he was also working for a farmer driving a truck for him. And that he allegedly wasn't getting paid, but he was working off a debt or a loan that this farmer allegedly gave him. And they were quoting it at $15 an hour for what he was working. He provided no documentation of how limited or minor that might have been, and admits that that had been several months ago. When you go back and read those testimony pages again, which I'd ask that your honors do at six pages, and read the flow of what the employee actually said, he's talking about the fact that the jobs that he allegedly was looking for were things that he could do while driving. So the inference is that he was already doing a driving job for his farmer, regardless of whether you think that it's repaying the debt and he's not technically getting money. He admitted that he was valuing, or the farmer was valuing his work at $15 an hour driving for him. It's evidence of employment. If the employee wanted to effectively argue that it was temporary sporadic and didn't reach the level of an actual job that he had earnings for, he could have or should have put forth more documentation that this was, oh, it was only, you know, $500 or $1,000 and I worked it off and it's 10 hours a week or something, to show that he would be entitled to maintenance. But the fact of the matter is, he admitted in testimony that he was capable of getting two jobs and did not put forth, other than saying two nights a week, $50 to $60, he didn't put forth any evidence that he was actually making that, so little, and he didn't document or testify any further as to the level to which he was doing the prior, the farming job, as evidence that he would be entitled to maintenance in this matter. One last statement with respect to what would be considered a self-directed job search that you have evidence for, even in the counselor's opinion, when he was evaluated, the retail plan said that he would be doing a normal job search would be 40 to 60 contacts per week. What he testified to, even if you believe him, is that he had a total of 20 over the course of a year leading up to trial. So that's, that's what I'll end with. So thank you for your time. Any questions from the court? No. Okay, very good. Thank you, counsel, both for your arguments in this matter this afternoon, it will be taken under advisement.